IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DAVID MOREIDA § | | |
|    TDCJ-CID #586565, § | | |
|           Plaintiff, § | | |
| V. § | | C.A. NO. C-06-376 |
| § | | |
| CYNTHIA HEIBEL, § | | |
|           Defendant. § | | |

**MEMORANDUM AND RECOMMENDATION
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiff David Moreida claims that defendant Cynthia Heibel, a nurse practitioner at the McConnell Unit, was deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (D.E. 1). Nurse Heibel moves for summary judgment to dismiss plaintiff's claims on the grounds of qualified immunity, arguing that plaintiff fails to state a constitutional violation because she provided acceptable medical treatment. (D.E. 15). Plaintiff has filed a response in opposition. (D.E. 17). For the reasons stated herein, it is respectfully recommended that defendant's motion for summary judgment be denied, and that this case proceed to trial.

**I. JURISDICTION**

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.  PROCEDURAL BACKGROUND

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and is currently incarcerated at the McConnell Unit in Beeville, Texas.  He filed this lawsuit on August 28, 2006 against Cynthia Heibel alleging that she failed to refer him timely to a physician to diagnosis properly his medical condition, and that the delay resulted in the amputation of his left ring finger, as well as unnecessary pain and suffering. (D.E. 1).  He seeks compensatory and punitive damages. (D.E. 1 at 12).

Defendant filed her answer on December 13, 2006, and raised the defense of qualified immunity.  (D.E. 9).  She filed the instant motion for summary judgment on April 5, 2007.  (D.E. 15).  Plaintiff filed his summary judgment response on May 3, 2007.  (D.E. 17).

## III.  SUMMARY JUDGMENT EVIDENCE AND UNCONTESTED FACTS

In support of her motion for summary judgment, defendant offers plaintiff's medical records, (D.E. 15, Ex. A), and the affidavit of Dr. Steven Mercado, (D.E. 30, Ex. B), a physician who has reviewed plaintiff's medical records.  In his response, plaintiff offers his affidavit, (D.E. 17, Ex. A), as well as copies of Sick Call Requests ("SCR") that he submitted.  (D.E. 17, Ex. B).[1]

The following facts are not in dispute:

---

[1] Defendant's exhibits are referred to as "DX," followed by the appropriate letter and page number.  "POC" refers to plaintiff's original complaint (D.E. 1).  Plaintiff's exhibits are referred to as "PX," followed by the appropriate letter and page number.  Curiously, many of the SCRs offered by plaintiff are *not* included in the medical records submitted by defendant.

2

On November 16, 2005, plaintiff reported to the McConnell Unit infirmary complaining that his left ring finger was painful and cold, and he was concerned because he is diabetic. (DX-B at 46-47). Plaintiff was seen by Nurse Heibel, and he told her that he had no pain at rest, but that his finger hurt when he bumped it. (Id. at 46). Upon examination, Nurse Heibel noted a mild Dupuytren's contracture at the base of the left ring finger, and that the distal phalanx was slightly more bluish in color and slightly colder than the other fingertips. (Id.) Her assessment was a possible vascular anomaly, mild, and her plan was to have plaintiff's hand x-rayed for further evaluation. (Id. at 47). In addition, she advised plaintiff to keep his hand warm. (Id.)

On November 20, 2005, plaintiff submitted a Sick Call Request ("SCR") asking for pain medication. (DX-B at 126; PX-B at 126). The SCR response indicated that the medication is ordered. (Id.)

On November 21, 2005, plaintiff returned to the infirmary to have his x-rays taken. (DX-B at 44-45). Although he was not scheduled for an examination, he saw Nurse Heibel and told her that he was still having numbess and coldness in his left ring finger. (DX-B at 44). Upon examination, Nurse Heibel noted that plaintiff's left ring finger was cooler than the others, but only minimally discolored, and when pinched, the blanch color would return in less than 2 seconds. (Id.) The x-rays showed no bony deformity, but linear areas of density along the medial aspect. (Id.) Nurse Heibel's assessment was calcifications of artery, left ring finger. (Id.) Her plan was to wait for the radiologist's formal report, and she instructed plaintiff to keep his finger warm and attempt not to injure it. (Id.)

On November 23, 2005, plaintiff submitted a SCR stating that he had not received his Ibuprofen as ordered by Nurse Heibel, and that he was in excruciating pain. (PX-B at 125). The SCR response indicates that Ibuprofen, 800 mg., was ordered. (Id.)

On November 28, 2005, plaintiff submitted a SCR requesting to see a doctor as soon as possible because he believed his finger was "drying up" and the pain was excruciating. (PX-B at 124). Plaintiff related that he could not sleep at night due to the pain. (Id.). He also complained that the x-rays had been taken over a week prior and that Nurse Heibel did not know what was wrong with him. (Id.). He requested that he be referred to Dr. Herrera immediately for evaluation. (Id.)

On December 10, 2005, plaintiff was seen in the infirmary complaining of severe finger pain. (DX-A at 2). The L.V.N. on call called Nurse Cherry at home who instructed the L.V.N. to place plaintiff's finger in a splint. (Id.) Nurse Cherry also changed plaintiff's pain medication to Indocin.[2] (Id.)

In a SCR stamped received December 12, 2005, plaintiff complained that he had still not seen a doctor regarding his finger despite the fact that x-rays were taken on November 21, 2005. (PX-B at 123). Plaintiff reported that his finger was cold, discolored, and the pain was relentless and excruciating. (Id.) He reported that, in response to his SCRs, he had been told to take Ibuprofen, but that it did not work. (Id.) He requested to see a doctor immediately, stating that he believed his finger was dying. (Id.)

---

[2] The December 10, 2005 infirmary visit is not included in plaintiff's medical records, but only in Dr. Mercado's chronological recitation.

On December 12, 2005, plaintiff returned to the infirmary for a follow-up visit where he was seen by Nurse Practitioner Lynne Cherry. (DX-B at 41-42). Plaintiff related that the pain in his finger similar to a tooth-ache, and that it had worsened over the last month and a-half. (Id. at 41). He reported that it initially felt better, then slowly started to swell and became more painful, and that he now could not bend it. (Id.) Nurse Cherry noted that his x-ray showed no evidence of fracture or subluxation; however, there was extensive arterial calcification. (Id.)

Nurse Heibel, who was present at the examination, reported to Nurse Cherry that there was no acute change from plaintiff's previous evaluation. (Id. at 42). Upon examination, Nurse Cherry noted that plaintiff's finger was cool to the touch and purple hued when held downward. (Id.) Capillary refill was less than 2 seconds. (Id.) There was decreased movement to flex finger. (Id.) Plaintiff complained that a splint prescribed over the weekend made his finger hurt more. (Id.) Nurse Cherry continued plaintiff on Indocin, instructed him to stop the splint, and requested an orthopedic evaluation, as well as a visual acuity test, due to plaintiff's type II diabetes. (Id.)

On December 16, 2005, plaintiff submitted a SCR stating that he needed to see Nurse Cherry again because his finger was getting worse and the Indocin that she had prescribed did not help with the pain. (PX-B at 121). He also requested to see a hand doctor soon, and stated that situation was an emergency. (Id.)

On December 19, 2005, plaintiff submitted a SCR stating that his finger was infected and that he considered the situation an emergency due to his diabetes. (PX-B at 122). On

that same day, the infirmary received a call from security reporting that plaintiff's finger was "turning black." (DX-B at 39). At the infirmary, Nurse Cherry noted that plaintiff's capillary refill was now greater than 3 seconds. (Id.) In addition, his finger was cool to touch, it reddened and remained purple when held downward, and it was infected with granuloma. (Id.) The pulse of the ring finger on the left hand was 88% compared to the third digit pulse of 96%. (Id.) Nurse Cherry's assessment was poorly controlled diabetes, controlled on medication, with arterial circulation to left hand third digit, secondary cellulitis to same digit, marked change in circulation. increase in edema, increase in pain while waiting orthopedics appointment. (Id.) After consulting with Dr. Turner, Nurse Cherry had plaintiff transported by van to the emergency room at John Sealy Hospital in Galveston, Texas. (Id.)[3]

At John Sealy Hospital, plaintiff was admitted to the Vascular Surgery Service for three days based on his symptoms of coolness and cyanosis of the left ring finger. (DX-A at 3). His echocardigram was normal; however, his MRI with provocative positioning suggested Thoracic Outlet Syndrome ("TOS"). (Id.) Plaintiff was started on Plavix, a blood thinner, and scheduled to returned to John Sealy on January 3, 2006 for surgery. (Id.)

Plaintiff was discharged from John Sealy on December 22, 2005, and arrived back at the McConnell Unit on December 27, 2005. (DX-A at 3). On December 29, 2005, he reported to the infirmary complaining of worsening pain in his finger. (DX-B at 36-37).

---

[3] Exhibit B contains only certain of plaintiff's medical records from the McConnell Unit; there are no records from his stay at John Sealy Hospital.

Nurse Cherry contacted Dr. England at John Sealy via an emergency video consultation, and it was decided to send plaintiff back to John Sealy immediately for further evaluation. (Id.)

At John Sealy, the physicians determined that plaintiff could wait until the January 3, 2005 surgery date. (DX-B at 34). He was continued on the Plavix, and sent back to the McConnell Unit. (Id.) On December 30, 2005, Dr. Herrera prescribed plaintiff Tylenol #3 for pain. (Id.)

On January 9, 2006, plaintiff underwent a resection of the left first rib to correct the TOS, with a simultaneous amputation of his left ring finger at John Sealy Hospital. (DX-A at 4). Plaintiff tolerated both surgeries well; however, he suffered complications in the recovery room, necessitating another surgery. (Id.)

On February 8, 2006, plaintiff was seen in the McConnell Unit infirmary for a follow-up visit following the amputation of his finger. (DX-B at 30-31). Nurse Cherry noted that his left hand was healing well without increased drainage or swelling. (Id. at 30). Plaintiff was started on antibiotics and continued with wound care treatment. (Id.)

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at

251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses.  See id.  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 248-49.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could

find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed." Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

## V.  DISCUSSION

**A.    Official capacity claims.**

Plaintiff has sued defendant in her official and individual capacity. He seeks compensatory and punitive damages. (See D.E. 1 at 12).

A suit against a prison employee in his official capacity is the same as a suit against the entity the employee represents. Kentucky v. Graham, 473 U.S. 159, 166 (1985). The Eleventh Amendment bars a suit for money damages against a state or state agency. Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). A judgment may not be entered against a state officer in his official capacity for violating federal law in the past. Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

To the extent plaintiff is suing Nurse Heibel in her official capacity for money damages, those claims are barred by the Eleventh Amendment, and it is respectfully recommended that those claims be dismissed with prejudiced as barred.

**B.     Qualified Immunity.**

Nurse Heibel moves for summary judgment on the grounds of qualified immunity. The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Federal courts use a two-step test to determine whether the defendant is entitled to qualified immunity. Freeman v. Texas Dep't of Crim. Justice, 369 F.3d 854, 863 (5th Cir. 2004). First, the court must determine whether plaintiff's allegations, if true, establish a constitutional violation. Hope, 536 U.S. at 736; Freeman, 369 F.3d at 863. Then, if a constitutional right was violated, the court must decide whether the right was clearly established at the time of the violation. Freeman, 369 F.3d at 863. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.'" Hope, 536 U.S. at 739 (citation omitted). To overcome a defendant's assertion of qualified immunity, a plaintiff must demonstrate that the defendant's conduct was objectively unreasonable in light of the legal rules clearly established at the time of his actions. Thomas v. City of Dallas, 175 F.3d 358, 363-64 (5th Cir. 1999).

**1.     Deliberate indifference to serious medical needs.**

Plaintiff claims that Nurse Heibel was deliberately indifferent to his serious medical needs because she failed to refer him to a qualified physician to correctly diagnosis his TOS. He argues that, as a nurse practitioner, Nurse Heibel was not qualified to make a diagnosis of his medical condition, and in attempting to do so, she was reckless and indifferent to his serious medical needs.

*Step 1: Constitutional violation.*

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege that the offending official acted with deliberate indifference to serious medical needs. Wilson v. Seiter, 501 U.S. 294, 303.(1991); Estelle v. Gamble, 429 U.S. 97, 105 (1976); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991).  Deliberate indifference encompasses more than mere negligence on the part of prison officials. Farmer v. Brennan, 511 U.S. 825, 837 (1994). It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. Farmer, 511 U.S. at 837. Furthermore, negligent medical care does not constitute a valid § 1983 claim. Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). See also Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim"). As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. Youngberg v. Romeo, 457 U.S. 307, 322-23 (1982). Finally, active

treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered. See Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999); Mendoza, 989 F.2d at 195; Varnado, 920 F.2d at 321. "Deliberate indifference is an "extremely high standard to meet." Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).

Defendant argues that her actions in addressing plaintiff's medical needs were reasonable and "within the standard of acceptable medical care" such that plaintiff fails to state a constitutional violation of deliberate indifference. She points out that she examined plaintiff's finger, prescribed him pain medication, and instructed not to damage it further. However, defendant fails to address plaintiff's uncontested testimony, that she initially failed to prescribe hm pain medication, repeatedly failed to refer him to a physician for proper evaluation, and repeatedly ignored his SCR asking to see a physician, but told him to just take his Ibuprofen. (PX-A at 1).

Defendant's Exhibit B has a business affidavit verifying plaintiff's medical records and states that it consists of **282** pages. (See DX-B, first page). However, there are only **14** pages of records attached as Defendant's Exhibit B. Of those fourteen pages, only **one** is a SCR. (See DX-B at 126). Plaintiff has submitted **five** additional SCRs that he wrote between November 23, 2005 and December 16, 2005. (See PX-B 125, 124, 123, 121, 122). Based on defendant's business affidavit to Exhibit B, plaintiff's own affidavit (PX-A), and plaintiff's Exhibit B, it is apparent that defendant has produced an incomplete copy of plaintiff's medical records, and has chosen to exclude many of plaintiff's SCR's. Plaintiff's

testimony and supporting SCRs create a genuine issue of material fact as to whether Nurse Heibel was deliberately indifferent to plaintiff's serious medical needs.

Plaintiff testified that, when he returned to the infirmary to get his x-rays as ordered, he saw Nurse Heibel and asked her about pain medication. (PX-A at 1). He claims that Nurse Heibel called him a "criminal" and told him that his medical needs were not important. (Id.) In addition, she told him she would ordered Ibuprofen "if she got around to it." (Id.) Based upon his review of plaintiff's medical records, Dr. Mercado notes that on November 20, 2005, in response to plaintiff's request for pain medication, he "found no documentation that pain medication was ordered." (DX-A at 2). On November 23, 2005, plaintiff submitted another SCR requesting pain medication. (PX-B at 125). Delay in treatment may be actionable under § 1983 if the delay results in substantial harm. See Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). Plaintiff has raised a material issue of fact concerning the delay in receiving pain medication.

Defendant appears to argue that her failure to diagnose plaintiff's TOS should be excused because TOS is rare and difficult to diagnose, even for a trained physician. (PX-A at 5-6). However, this argument fails for two reasons. First, from the onset, defendant suspected that plaintiff had a vascular anomaly, and this was confirmed by x-rays on November 21, 2005. (DX-B at 46-47, 44-45). Second, given the fact that she is not a trained physician and might in fact be dealing with rare conditions, gives her all the more reason to seek advice from a physician. That is, an issue exists as to whether Nurse Heibel exercised professional medical judgment in ***not*** referring plaintiff to a physician for examination

13

sooner.  See Youngberg v. Romeo, 457 U.S. 307, 322-23 (1982).  Plaintiff repeatedly requested that he be seen by a doctor.  (PX-B at 124, 123, 121).  As soon as he was seen by a doctor, a diagnosis was made and a proper plan of treatment formulated; however, by this time, it was to late to save plaintiff's finger.  (PX-A at 3).  Plaintiff has stated a constitutional violation against Nurse Heibel.

### *Step 2: Objective reasonableness.*

For a right to be clearly established under the second step of the qualified immunity analysis, "[t]he contours of that right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Although the Eighth Amendment "does not, by its precise words, mandate a certain level of medical care for prisoners," Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), " the Supreme Court has interpreted it as imposing a duty on prison officials to "ensure that inmates receive adequate ... medical care." Farmer, 511 U.S. at 832.  The mere delay of medical care can constitute an Eighth Amendment violation but only if the deliberate indifference results in "substantial harm." Wilson, 501 U.S. at 297.

In this case, plaintiff's right to adequate medical care is well established and defendant makes no argument that she was not aware of the contours of that right.  Plaintiff has established that there was delay in his being referred to see a physician and that the delay resulted in substantial harm, that is, gangrene and the subsequent amputation of his finger.  Thus, a fact issue exists as to whether Nurse Heibel's actions were objectively reasonable

14

under the circumstances of this case. See Easter v. Powell, 467 F.3d 459, 465 (5th Cir. 2006) (prison nurse not entitled to immunity where delay in treatment caused substantial harm).

**C.     Pendent State Law Claims.**

In his original complaint, plaintiff also raised the state law claim of intentional infliction of emotional distress.

The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress that the plaintiff suffered was severe. Miller v. Raytheon Aircraft Co., ___ S.W.3d ___, 2007 WL 1166161 (Tex. App.– – Houston [1st. Dist.] Apr. 19, 2007). Defendant claims that she is entitled to official immunity for claims arising from the performance of her discretionary duties in good faith, as long as she was acting within the scope of her authority. See City of Lancaster v. Chambers, 883 S.W.2d 650. 653 (Tex. 1994).

A fact issue as to whether defendant was acting in good faith in the performance of her discretionary duties. Plaintiff has offered evidence suggesting that defendant ignored his complaints of pain and that his medical situation was an emergency. He repeatedly requested to see a doctor, and that request was denied. It is respectfully recommended that defendant's requests for official immunity on plaintiff's pendant state law claim be denied.

## VI. RECOMMENDATION

Plaintiff's claims of deliberate indifference against Nurse Heibel in her official capacity are barred by the Eleventh Amendment, and it is respectfully recommended that

15

those claims be dismissed as such. However, a genuine issue of material fact exists regarding plaintiff's claim of deliberate indifference against Nurse Heibel in her individual capacity and plaintiff's state law claim of intentional infliction of emotional distress. Thus, it is respectfully recommended that Nurse Heibel's motion for summary judgment (D.E. 15) be denied, and that plaintiff's claims against her proceed to trial.

Respectfully submitted this 15th day of May, 2007.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).